788 A.2d 200

## NEW BOARD OF SCHOOL COMMISSIONERS OF BALTIMORE CITY

v.

## PUBLIC SCHOOL ADMINISTRATORS AND SUPERVISORS ASSOCIATION OF BALTIMORE CITY.

No. 2141, Sept.Term, 2000.

Court of Special Appeals of Maryland.

Jan. 2, 2002.

62

Edward J. Gutman (Blum, Yumkas, Mailman, Gutman & Denick, P.A., on the brief), Baltimore, for appellant.

Bradford W. Warbasse (Robert E. Sharkey and Gordon, Feinblatt, Rothman, LLC, on the brief) Baltimore, for appellee.

Argued before SALMON, ADKINS, and MARVIN H. SMITH (Retired, Specially Assigned), JJ.

MARVIN H. SMITH, Judge, Retired, Specially Assigned.

The New Board of School Commissioners of Baltimore City ("the City Board") is the appellant and cross-appellee in this appeal. The appellee and cross-appellant is the Public School Administrators and Supervisors Association of Baltimore City ("the Association"), which represents all principals, assistant principals, and other administrative and supervisory employees of the Baltimore City Public School System. The Association negotiated an agreement, known as a "Memorandum of Understanding," with the City school system concerning certain working conditions of the employees the Association represents.[1]

This appeal and cross-appeal concern eight principals who were reassigned at the end of the 1997–98 school year to assistant principal positions.[2] At issue is whether the State Board of Education ("the State Board") was required to conduct an evidentiary hearing before ruling on the propriety of a decision of the City Board, to the effect that the reassignments were not subject to arbitration pursuant to a collective

---

[1]. The Memorandum of Understanding which concerns this appeal was in effect from July 1, 1997 through June 30, 2000. *See generally* Md. Code (1978, 1999 Repl. Vol., 2001 Cum. Supp.), § 6–407 of the Education Article (authorizing designated employee organizations to negotiate on behalf of the employees they represent).

[2]. The record reflects that the Association initiated grievances for ten principals who were reassigned. For reasons not explained in the record, the grievances of two of the principals were aborted at some point, and this appeal concerns the reassignments of only eight of the principals.

bargaining agreement. Assuming no evidentiary hearing was required, a second issue is whether the State Board's affirmance of the City Board's decision was correct as a matter of law.

## FACTS

There is no dispute that each of the former principals has been employed by the Baltimore City Public School System for 25 to 30 years. The Association informs us that none of the principals had received an unsatisfactory performance evaluation prior to the end of the 1997–98 school year.[3]

In early June of 1998, Dr. Robert Schiller, then the Interim Chief Executive Officer ("the CEO") of the City Board, sent letters to each of the eight principals. Each letter stated that the principal would "be reassigned to the position as an assistant principal or to an equivalent level position for the FY '99, effective July 1, 1998." Each letter further stated that the principal's salary would "be adjusted accordingly." By way of explanation for the actions, each letter stated: "A determination has been made that [the reassignment] is in the best interests of the Baltimore City Public School System...."

The Association filed grievances with the CEO on behalf of each of the eight principals.[4] Each grievance stated that the principal had been "[a]rbitrarily and capriciously demoted to asst. principal...." Each alleged vaguely that the demotion violated the evaluation procedures set forth in Article VII of the Memorandum of Understanding, and that it also was contrary to past practice. The CEO declined to process the grievances and returned them to the Association.

---

**3.** The Association does not mention, and the record does not reveal, whether any of the principals received an unsatisfactory evaluation at the end of the 1997–98 school year.

**4.** *See* Code (1978, 1999 Repl. Vol., 2001 Cum. Supp.), § 4–205 of the Education Article.

The Association then filed, on behalf of the principals, appeals to the City Board from the CEO's actions. The Association indicated that the appeals were filed in accordance with Article XV of the Memorandum of Understanding between the Association and the City Board. Article XV set forth grievance and arbitration procedures.

Initially, the City Board refused to process the appeals on the ground that the CEO had statutory authority to reassign the principals, and that the statutory authority trumped any provisions set forth in the Memorandum of Understanding. The City Board apparently believed that under the circumstances it had no authority to consider the appeals. The Association then submitted a request for arbitration to the American Arbitration Association.

The City Board subsequently reconsidered the matter and determined that it *did* have statutory authority to consider the appeals.[5] The City Board instructed the Association to submit separate appeals in writing as to each of the principals. It indicated that it would decide the appeals based on the written submissions unless it determined that a particular appeal should be submitted to a hearing officer for factual determinations because "specific allegations of fact . . ., if true, would prove that the decision to reassign was arbitrarily unreasonable . . . or illegal. . . ."

The Association withdrew its request for arbitration. It submitted letters to the City Board, on behalf of the principals, in which it asserted in essence that the CEO had acted arbitrarily and capriciously in that he had (1) failed to offer any explanation for the reassignments except to state that they were in the "best interests of the school system," and (2) failed to follow a longstanding practice of permitting employees who are reassigned to lower level positions to retain their job titles and the higher pay rates.[6]

---

**5.** *See id.,* § 4–205(c)(3).

**6.** The Association also argued that if the principals were reassigned because standardized test scores for students at their school were low—

The City Board did not submit any of the appeals to a hearing examiner. Instead, it issued a written opinion in which it concluded that "[t]he reassignments were implemented by the Interim CEO acting properly within the scope of his statutory responsibilities." The City Board determined that the Association "has articulated no basis to support its claim that the CEO acted arbitrarily or outside of his authority in either making the transfers or reducing the salaries of the former principals to the appropriate level for their current positions."

The Association renewed its request for arbitration. The City Board, however, filed a petition in the Circuit Court for Baltimore City to stay arbitration until the State Board could decide if the matter was negotiable. The trial court granted the petition and observed in a two-page order that "it is . . . as a matter of public policy recommended that Courts defer to the expertise of the State Board of Education in the first instance when called upon to decide whether a matter relates to educational policy or salaries, wages, hours, and other working conditions. . . . " The court directed the Association to "appeal" the City Board's decision to the State Board.

The Association filed the appeal to the State Board as directed. The Association conceded to the State Board that the CEO has statutory authority to assign and transfer principals as the needs of the schools require.[7] It nevertheless argued that, under the Memorandum of Understanding in effect at the time of the reassignments, the CEO could not change the job titles or reduce the salaries of the reassigned principals.

---

and the Association made clear that it was only speculating that low test scores might have been behind the reassignments—the reassignments were nevertheless arbitrary. The Association contended that a principal should not be summarily blamed for low test scores, since they could be attributed to other factors such as a previous principal, an inherited faculty, or a transient student body.

7. *See* Code (1978, 1999 Repl. Vol.), § 6–201(b) of the Education Article.

The City Board moved for summary affirmance of its decision that the CEO's actions were proper, and the State Board granted the motion. In a brief opinion, the State Board explained that "a transfer of a principal to a lateral position or to a position of lower rank is within the discretion of the local superintendent." [8] It further explained that, "[d]espite [the Association's] attempt to separate matters of salary from that of reassignment to a new position, we believe that these issues are indistinguishable when an employee is transferred pursuant to the CEO's [statutory] authority...." [9] The State Board concluded:

Here, certain principals were reassigned for the subsequent school year by the Interim CEO acting properly within the scope of his statutory responsibilities.... In accordance with the reassignment, the employees' salaries for the next year were appropriately adjusted to reflect their assignments to lower level positions. This salary adjustment is a necessary part of the CEO's statutory authority to transfer professional personnel as the needs of the schools require.

Because the issue in this case actually concerns the CEO's [statutory] transfer authority ... and not a salary dispute, we find that the local board acted properly in declining to process the disputes as grievances and in declining to submit the disputes to arbitration.[10]

The Association petitioned for a judicial review. It asked the Circuit Court for Baltimore City to "reverse the decision of the State Board, rule that agreements with respect to the salaries to be paid principals following their reassignment [are] subject to arbitration under the [Memorandum of Under-

---

**8.** *Pub. Sch. Adm'rs and Supervisors of Baltimore City v. New Bd. of Sch. Comm'rs of Baltimore City,* — Op. MSBE ——, ——, MSBE Op. No. 01–3 at 2 (2001).

**9.** *Id.,* ——, 667 A.2d 970 Op. MSBE at ——, MSBE Op. 01–3 at 3 (citing § 6–201(b) of the Education Article).

**10.** *Id.,* ——, 667 A.2d 970 Op. MSBE at ——, MSBE Op. 01–3 at 3.

standing], and remand this case to the State Board for further proceedings."

The circuit court heard oral argument, then issued a written opinion. Although the Association did not ask the court to remand the case to the State Board for an evidentiary hearing, and indeed never requested that the State Board hear more than oral argument, the court remanded the case to the State Board for a full evidentiary hearing. The court thus implicitly vacated the State Board's decision. It wrote:

> The substantial rights, including the Constitutional Due Process Rights, of the [Association] were violated when the MSBE failed to hold a hearing on the matter before rendering its opinion. Without such factual basis the Court cannot apply the law. . . .

It added:

> . . . [T]his Court finds that [the] Interim CEO . . . did simply regurgitate his statutory authority to reassign the Principals and . . . was hiding behind such authority when he gave no other reasons for the Principal's reassignment but for the "in the best interest of the School" provision. Furthermore, this Court finds that the Principals were not given any other reasons for their reassignment because there were no hearings, at any level of the School Board, in this case. This total lack of rights given under precedent of the decisions cited herein and the lack of Due Process guaranteed by the United States Constitution, makes this Court greatly suspect as to the true reasons for the reassignment of the Principals in this matter.

## ISSUES

As we have indicated, the City Board has appealed and the Association has cross-appealed from the trial court's decision.

The City Board argues, in essence, that the trial court should have affirmed the State Board's decision. The Association argues, in essence, that the trial court should have reversed the State Board's decision and instructed the State Board to issue a new decision to the effect that the salaries of

the reassigned principals are subject to arbitration. Both parties argue that the trial court erred by remanding the case to the State Board for an evidentiary hearing.

We find merit in the arguments presented by the City Board. We shall therefore vacate the judgment of the circuit court and remand the case to that court with instructions to affirm the decision of the State Board.

## STANDARD OF REVIEW

"Under Maryland law, when the Court of Special Appeals is reviewing an appeal originating out of an administrative agency, the role of the appellate court is 'precisely the same as that of the circuit court.'" *Bragunier Masonry Contractors, Inc. v. Maryland Comm'r of Labor and Indus.*, 111 Md.App. 698, 716, 684 A.2d 6, 15 (1996) (citation omitted). "Thus, 'we must review the administrative decision itself.'" *Mayberry v. Bd. of Educ. of Anne Arundel County*, 131 Md.App. 686, 700, 750 A.2d 677, 684 (2000) (citation omitted).

We examine the agency decision in the same way as the trial court. We examine the decision for errors of law, a nondeferential review ..., and to determine if substantial evidence exists to support the conclusion, a deferential review.

*Bragunier Masonry Contractors, Inc.*, 111 Md.App. at 716, 684 A.2d at 15 (citations omitted). We keep in mind that

[a]n agency's interpretation of the statute it administers is generally entitled to weight.... This principle is particularly important in the case of the State Board of Education ... [in that] "the paramount role of the State Board of Education sets it apart from most administrative agencies."

*Montgomery County Educ. Assoc., Inc. v. Bd. of Educ. of Montgomery County*, 311 Md. 303, 309, 534 A.2d 980, 983 (1987) (citation omitted). "The authority of the State Board of Education ... has been described as 'a visitatorial power of the most comprehensive character,' one that is 'in its nature, summary and exclusive.'" *Chesapeake Charter, Inc. v. Anne Arundel County Bd. of Educ.*, 358 Md. 129, 137, 747 A.2d 625,

629–30 (2000) (citation omitted). The State Board is "invest[ed] ... with the last word on any matter concerning educational policy or the administration of the system of public education." *Wilson v. Bd. of Educ. of Montgomery County*, 234 Md. 561, 565, 200 A.2d 67, 69 (1964).

## DISCUSSION

### — *Propriety of Ordering Evidentiary Hearing* —

The trial court suggested that the manner in which the eight principals were reassigned denied them procedural due process. Despite the fact that neither party had requested that the State Board conduct an evidentiary hearing, the trial court remanded the case to the State Board for just such a hearing.

█ As the Court of Appeals has explained:

The first prerequisite in raising a due process argument is that the action complained of must constitute "state" action. ... Next, the state action must result in a "deprivation" of the complainant's interest ... and such interest must be a "property" interest within the meaning of the due process clause [of the Fourteenth Amendment of the United States Constitution and Article 24 of the Maryland Declaration of Rights]. ... Finally, if state action deprives one of a property interest, the court must balance the various interests at stake in order to determine the procedural due process which is constitutional required under the circumstances. ...

*Pitsenberger v. Pitsenberger*, 287 Md. 20, 27–28, 410 A.2d 1052, 1056–57 (1980) (citations omitted).

█ In the context of administrative decisions, as in other decisions,

"[d]ue process does not require adherence to any particular procedure ... The minimum due process required where a deprivation of a property interest is involved is that the deprivation be preceded by 'notice and opportunity for hearing appropriate to the nature of the case.' ... In order

to determine what due process is required, there must be a balancing of the private and government interests affected . . ."

*Bragunier Masonry Contractors, Inc.,* 111 Md.App. at 712, 684 A.2d at 13 (citations omitted). The factors to be considered in addressing procedural due process in an administrative setting are:

"[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail."

*Id.,* 684 A.2d at 13 (citation omitted).

The parties do not dispute that the process afforded by the State Board was all the process due *at that point.* That is, they agree that the only question before the State Board was whether the reassignments of the principals were subject to negotiation. They further agree that it was unnecessary for the State Board to conduct an evidentiary hearing in order to resolve that question. The parties disagree only on whether the legal conclusion reached by the State Board was correct.

 In effect, the trial court ordered the Association to seek, and the Association sought, a declaratory ruling from the State Board. *See* Code (1978, 1999 Repl. Vol.), § 2–205(e)(1)(i) and (2) of the Education Article ("The State Board shall explain the true intent and meaning of the provisions of . . . [t]his article that are within its jurisdiction . . .," and "[t]he Board shall decide all controversies and disputes under these provisions"). Article XV of the parties' Memorandum of Understanding set forth a grievance procedure which culminated in arbitration.[11] It was implicit in the Memorandum of

---

11. Under the Memorandum of Understanding, an aggrieved member of the Association could submit his or her grievance to his or her immedi-

Understanding that a grievance had to concern a negotiable matter before the grievance procedure had to be followed. *See generally* Code (1978, 1999 Repl. Vol., 2001 Cum. Supp.), § 6–408 of the Education Article (regarding arbitration provisions in agreements between local school boards and employee organizations). Thus, only if the State Board had issued a ruling in the Association's favor would more process—arbitration—have been due.

 The question of whether the salary reductions that accompanied the reassignments in this case were negotiable was indeed a pure question of law. The Association has never suggested that a full evidentiary hearing should have been conducted at any stage of the grievance, including before the City Board, and the record does not suggest that such a hearing was ever warranted.[12] Under the circumstances, it was entirely proper for the Board to decide the matter without first hearing evidence.[13] *See* Md. Regs. Code Tit. 13A,

ate supervisor, appeal the supervisor's decision to the CEO, appeal the CEO's decision to the City Board, then submit the matter to arbitration.

**12.** Even if the Association had alleged that a factual dispute existed when the grievance was before the City Board—and the Association did not so allege—nothing in the record indicates that the City Board should have conducted an evidentiary hearing. In filing the grievances with the City Board, the Association contended (1) that the CEO acted arbitrarily and capriciously, in that he failed to explain the reasons for the reassignments except to state that they were in the "best interests of the Baltimore City Public School System," and (2) that the CEO failed to follow "a long-standing past practice" of permitting the reassigned principals to keep their titles and salaries. The Association proffered nothing that would have established that the reassignments were *not* in the best interests of the school system, and proffered no specific information regarding the alleged "long-standing past practice." As in *Hurl v. Bd. of Educ. of Howard County*, 107 Md.App. 286, 310, 667 A.2d 970, 982 (1995), where this Court ruled that a teacher was properly denied an evidentiary hearing regarding her transfer, the Association "never alleged facts indicating that [the principals were] somehow being improperly discriminatorily, randomly, or unjustly singled out or targeted by the [CEO]."

**13.** Even if it had been necessary for the State Board to make findings of fact, the Board would not necessarily have been required to conduct a full evidentiary hearing but might have relied on the representations of

§ 01.01.03K(1) ("The State Board may issue a decision on a motion for summary affirmance when there are no genuine issues as to any material facts"). While the State Board might have properly chosen to hear the legal arguments of counsel, it is apparent that the Board believed that it had been sufficiently apprized of the parties' positions by way of the memoranda and other documents that had been filed. Upon reviewing the memoranda and other documents, we perceive no error.

## — *Arbitrability of Salaries* —

The Association concedes that, under § 6–201(b)(2)(ii) of the Education Article, the CEO has authority to reassign principals "as the needs of the schools require." It argues, however, that unless he or she has been properly demoted for cause, a principal who is reassigned to a lower level position must continue to receive the salary he or she received as a principal. The Association posits that under the Memorandum of Understanding a principal's pay could be reduced only if he or she was demoted as the result of a second consecutive unsatisfactory performance evaluation. In an effort to establish the validity of the contract provision, the Association points to Code (1978, 1999 Repl. Vol., 2001 Cum. Supp.), § 6–408(b)(1) of the Education Article, which states that, "[o]n request," a public school employer or its representatives shall negotiate with employee organizations "on all matters that relate to salaries, wages, hours, and other working conditions."

The Court of Appeals has explained that "a local board is either required to agree to negotiate a particular subject, or it is not permitted to agree to negotiate that subject. Maryland law leaves no room for subjects that a local board may, but need not, agree to negotiate." *Montgomery County Educ. Ass'n, Inc. v. Bd. of Educ. of Montgomery County*, 311 Md.

the parties in their memoranda and other documents. "[A]dministrative agencies generally are not bound by the technical common law rules of evidence." *Dep't of Pub. Safety and Corr. Servs. v. Cole*, 342 Md. 12, 31, 672 A.2d 1115, 1125 (1996).

303, 313, 534 A.2d 980, 985 (1987). The State Board has consistently taken the position that nothing in the Education Article "limits the authority of the appointing power to remove an administrator for any reason satisfactory to that appointing power; nothing in the statutes entitles an administrator, so removed, to any hearing. . . ." *Hayes v. Bd. of Educ. of Carroll Co.*, 1 Op. MSBE 719, 723 n. 1 (1978) (involving reassignment of principal to teaching position). Thus, according to the Board, the reassignment of a principal is a non-negotiable matter. The Board has stated that, while a classroom teacher may attain tenure, "an administrator attains no tenure in his status as such," but only in his or her status as a school system employee. *Id. See also Hoover v. Bd. of Educ. of Washington County,* 7 Op. MSBE 333 (1996) (involving reassignment of principal to teaching position); *Chenowith v. Bd. of Educ. of Baltimore County,* 7 Op. MSBE 197 (1995) (involving reassignment of assistant principal to office of recruitment); *Cameron v. Baltimore County Bd. of Educ.,* 6 Op. MSBE 814 (1995) (involving reassignment of assistant principal to teaching position).

The State Board has implicitly maintained that salaries and job assignments are inseparable, and that the authority to reassign an employee to a lower level position encompasses the authority to reduce the employee's salary. *See* Code Md. Regs. Tit. 13A, § 07.02.01B (indicating that, although the salary of an employee who is reassigned during the school year may not be reduced for the remainder of that year, it may be reduced for the following school year). *See, e.g., Hayes,* 1 Op. MSBE 719; *Hoover,* 7 Op. MSBE 333; *Chenowith,* 7 Op. MSBE 197; *Cameron,* 6 Op. MSBE 814; *Einem v. Howard County Bd. of Educ.,* 5 Op. MSBE 327 (1989). Neither this Court nor the Court of Appeals has previously reviewed this precise issue. In *Bd. of Educ. for Dorchester County v. Hubbard,* 305 Md. 774, 506 A.2d 625 (1986), however, the Court of Appeals made clear that the State Board's position on such a matter is virtually inviolable.

*Hubbard* involved, *inter alia,* two Dorchester County teachers who received unsatisfactory performance evaluations. As

a result of the evaluations, the school superintendent revoked the teachers' first-class teaching certificates and issued second-class teaching certificates in their places. *See generally* Code (1978, 1999 Repl. Vol.), § 6–102 of the Education Article (regarding teaching certificates). Unlike teachers with first-class certificates, teachers with second-class certificates are not entitled to salary increments based on experience. *See id.,* § 6–301. The teachers filed grievances and sought to have the matters submitted to arbitration. The local board sought a declaration from the Circuit Court for Dorchester County that the matters were not arbitrable, but the court declared that the case should go to arbitration. The Court of Appeals reversed and explained that the determination should be made by the State Board.

The Court pointed out in *Hubbard,* 305 Md. at 788, 506 A.2d at 631–32, that under § 2–205(e)(1)(i) and (2) of the Education Article "[t]he State Board shall explain the true intent and meaning of the provisions of ... [t]his article that are within its jurisdiction ...," and "[t]he Board shall decide all controversies and disputes under these provisions." Under § 2–205(e)(3), moreover, "[t]he decision of the Board is final." *See Hubbard,* 305 Md. at 788–89, 506 A.2d at 632. The Court recognized that, under § 6–408(b)(1) of the Education Article, a public school employer or its representatives must negotiate with employee organizations "on all matters that relate to salaries, wages, hours, and other working conditions." *See Hubbard,* 305 Md. at 790, 506 A.2d at 633. The Court reasoned that, even though the revocation of the teaching certificates affected the salaries of the teachers in question, "[o]bviously decisions whether the classification of teacher's certificates ... are subject to collective bargaining involve 'the true intent and meaning of the provisions' of the Education Article." *Id.,* 506 A.2d at 633 (quoting § 2–205(e)(1) of the Education Article). The Court concluded that the Legislature had "expressly commit[ted] this function to the jurisdiction of the State Board of Education." 305 Md. at 790, 506 A.2d at 633.

In *Montgomery County Educ. Ass'n, Inc.*, 311 Md. 303, 534 A.2d 980, the Court of Appeals affirmed the State Board's determination that a local school board's decision to reclassify employees is not subject to negotiation even though such a decision impacts upon salaries. The Court discussed the interplay between §§ 2–205(e) and 6–401(b)(1), and explained:

> ... [No] clear line distinguishes matters of educational policy from matters subject to collective bargaining.... For example, matters that fall directly under § 6–408(b)(1) such as salary levels and hours of work also implicate educational policy considerations: higher salaries for some teachers may be necessary to attract or retain qualified personnel, and longer hours may enhance educational achievement.... In fact, virtually every managerial decision in some way relates to "salaries, wages, hours, and other working conditions," and is therefore arguably negotiable.

311 Md. at 316, 534 A.2d at 986 (citations omitted). The Court observed that, "to determine whether a particular matter falls within § 6–408(b)(1), the State Board has balanced the interests of employees against the interests of the school system as a whole." 311 Md. at 316, 534 A.2d at 986. It commented:

> We can hardly find this balancing approach unreasonable. Section 6–408(b)(1) is capable of two extreme interpretations, neither of which the General Assembly could have intended. By mandating collective bargaining on any matter that relates to "salaries, wages, hours, and other working conditions," to the first interpretation would place most educational policy decisions on the table. On the other hand, by exempting from § 6–408(b)(1) any question of educational policy, the second interpretation would practically nullify the mandate to engage in collective bargaining.

311 Md. at 316, 534 A.2d at 986. The Court concluded that the line between educational policy matters and matters subject to collective bargaining will be "elusive in many contexts." In fact, courts have noted the necessarily ad hoc nature of such determinations.... Consequently, applica-

tion of the State Board's expertise is extremely important. Unless it is demonstrated in a particular case that the line drawn by the State Board under § 6–408(b)(1) is arbitrary, or clearly in violation of the Education Article, or otherwise contrary to law the State Board's determination will normally be controlling.

311 Md. at 318, 534 A.2d at 987 (citations omitted). *See also Washington County Educational Classified Employees Assoc. v. Bd. of Educ. of Washington County*, 97 Md.App. 397, 629 A.2d 1330 (1993) (salary changes that accompany local board's reclassification of employees are not subject to arbitration). *See generally Hurl v. Bd. of Educ. of Howard County*, 107 Md.App. 286, 299, 667 A.2d 970, 977 (1995) (explaining that the State Board's decisions regarding the administration of Maryland's public schools are "beyond judicial interference" unless they are contrary to law or arbitrary or capricious, or the State Board "exercised its power in bad faith, fraudulently, or in breach of trust").

▪▪▪ The Association contends that the State Board erred, as a matter of law, when it determined that the salary reductions that accompanied the reassignments of the eight principals were not arbitrable. It further suggests that the State Board erroneously deferred to the decision of the City Board instead of exercising its own judgment. We have carefully reviewed the State Board's decision, and we detect no indication that the State Board applied an incorrect standard of review. Clearly, the State Board followed its own, well-established precedent. Giving due deference, as we must, to the paramount role of the State Board in interpreting the Education Article, we perceive no error on the part of the State Board.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED; CASE REMANDED WITH INSTRUCTIONS TO AFFIRM THE DECISION OF THE MARYLAND STATE BOARD OF EDUCATION.

APPELLEE/CROSS APPELLANT TO PAY THE COSTS.